IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| KATHRINE S. McKEE,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,[1]<br>Commissioner of Social Security,<br><br>Defendant. | No. C06-4077-PAZ<br><br>**MEMORANDUM OPINION AND ORDER** |

This matter is before the court on judicial review of the defendant's final decision denying the plaintiff's applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income benefits under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.* The plaintiff Kathrine S. McKee filed her applications on July 12, 2004, alleging she has been disabled since March 23, 2004, due to carpal tunnel syndrome, fibromyalgia, cervical spine problems, and loss of range of motion in her right shoulder. She claims these conditions prevent her from lifting more than five pounds with her right arm; doing any lifting above her head, pulling, grasping, or grabbing with both arms; and bending forward.

McKee's applications were denied initially and on reconsideration. She requested a hearing, and a hearing was held on January 26, 2006, before Administrative Law Judge ("ALJ") Robert Maxwell. McKee was represented by counsel at the hearing, and McKee and her husband Steven both testified at the hearing. Vocational Expert ("VE") William Tucker also testified. On March 28, 2006, the ALJ found McKee was not disabled, nor

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA"). On February 12, 2007, Michael J. Astrue became Commissioner of the SSA, and he hereby is substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d)(1).

had she been disabled at any time through the date of his decision. McKee appealed the ALJ's decision, and on July 20, 2006, the Appeals Council of the Social Security Administration denied her request for review, making the ALJ's decision the final decision of the Commissioner.

McKee filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. On October 3, 2006, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

## I. REVIEW OF THE ADMINISTRATIVE RECORD

### A. *Background facts and hearing testimony*

McKee lives in Sibley, Iowa, with her husband Steven and two teenaged children. She completed the 11th grade and most of the 12th grade in school, but left school about two weeks before she would have graduated. She has not obtained a G.E.D., and she has had no further education or training in any field.

McKee was forty years old at the time of the hearing. She summarized her employment history for the fifteen years preceding the hearing as follows:

> Well, I worked in industrial laundry doing hospital laundry, folding sheets and pillow cases and hospital towels and that kind of thing. I worked at three different egg plants, which would be inspecting eggs, shell eggs, and one place I packaged eggs for shipment to stores. I worked as a janitor at one place. And I also – a bag inspector at my last job. And I sewed hems on jeans at one of my jobs.

In her most recent job, she was a quality control technician at a bag company. She inspected large dog food bags as they came off of a machine called a "bottomer. When McKee started working on the bottomer in the summer of 2000, there were five people inspecting the bags coming out of the machine. After a few months, two of the inspectors

left and were not replaced, leaving three inspectors doing the work that five had performed previously. After her workload increased, McKee began experiencing tingling and cramping in her hands, burning and stiffness in her shoulders and upper back, pain in her lower back, and a sensation that her elbows were "locking." McKee saw her family doctor, Gregory Kosters, D.O., regarding her symptoms, and he prescribed night splints, anti-inflammatory medication and pain medication. When these measures failed to relieve McKee's symptoms, Dr. Kosters referred her to Tom Howey, M.D., an orthopedic specialist. In the spring of 2001, Dr. Howey performed carpal tunnel release surgery on each of McKee's hands, and also removed ganglion cysts from her wrists.

According to McKee, Dr. Howey recommended she be off work while she recovered from surgery, but her employer put her on a light duty job instead. McKee stated the light duty job involved "sit[ting] at the plant, doing nothing." After the surgeries, McKee was unable to return to her previous duties on the bottomer machine due to constant pain and the effects of her medications. Her employer changed her work duties to a "popcorn reclaimer" job, which involved handling small microwave popcorn bags. She was able to perform the functions of that position at her own pace, although she continued to have constant pain.

In June 2003, McKee returned to see Dr. Howey, complaining that her right thumb was "starting to catch." She was having difficulty hanging onto things and experienced pain when she performed grabbing activities. She had to call in sick to work on occasion because of the level of her pain. Dr. Howey performed thumb release surgery on McKee's right hand, but McKee stated the surgery failed to provide her with any relief. In August 2003, Dr. Howey performed surgery on McKee's right elbow which, according to McKee, was supposed to release the tension in her hand. She stated she received no relief from the surgery. In September 2003, Dr. Howey opined McKee had reached maximum medical improvement on her right side, and he imposed a five-pound lifting restriction. Because

McKee had little improvement from the surgery, the doctor recommended she not proceed with similar surgery on her left arm.

McKee filed a worker's compensation claim as a result of her symptoms. During the worker's compensation case, McKee was evaluated by two physicians. In January 2004, the worker's compensation carrier referred her to Robert Steg, M.D. for an independent medical evaluation. Dr. Steg noted McKee's work as a bag inspector involved repetitive grasping, gripping, and manipulation of bags with both hands. In the history McKee gave to Dr. Steg, she reported her activities had been limited by her condition as follows:

> [D]ue to these injuries, she has had to discontinue bowling and she cannot paint or do artwork. She cannot mow the lawn or shovel snow. It is very painful for her to run the vacuum. She cannot scrub the floor and it hurts to fold clothing. Regarding carrying groceries, she can only carry a loaf of bread. She finds it too painful to carry a gallon of milk. Some mornings she needs help to dress as she has difficulty with buttons and snaps. Also she has difficulty opening jars. After driving 18 miles she will need to rest one of her hands.

McKee stated she was taking only Ibuprofen for her pain, two or three days per week. After she took the Ibuprofen, she often experienced dyspepsia and aggravation of her GERD, for which she would take Prilosec.

From his examination of McKee, Dr. Steg assigned her a 16% right upper extremity impairment and a 5% whole person impairment due to chronic cervical muscle strain, which he indicated equates to a 15% impairment of the body as a whole. The doctor set forth the following permanent work restrictions:

> Due to Mrs. McKee's Bilateral Carpal Tunnel Syndrome with releases, Bilateral de Quervain's constricting Tenosynovitis, Bilateral Lateral Epicondylitis, Right Shoulder Rotator Cuff Tendonitis/Impingement Syndrome and chronic Cervical Strain, she should continue to restrict lifting with her hands to less than 5 pounds and she should restrict the use of her hands

>    for repetitive grasping, pushing, pulling and fine manipulation to an occasional basis (1% to 33% of the time). She should avoid working with her right arm at or above the shoulder level. Due to her chronic cervical muscle strain she should limit working in a bent forward position to only on an occasional basis (1% to 33% of the time).

In December 2003, Dr. Howey evaluated McKee for an impairment rating. The doctor's notes are less than clear. They indicate the doctor did range of motion testing and ascertained that McKee "had full flexion with a 5° extension lag," resulting in "a 1% impairment rating due to her slight extension lag." Although not specified, presumably this rating applied only to McKee's right arm. The doctor amended McKee's lifting restriction to lifting as tolerated with her right rm.

Dr. Kosters examined McKee on February 18, 2004, and wrote an opinion letter in which he included the following observations and findings:

>    Based on examination of Kathrine McKee on this date, I certainly believe that the ratings that Dr. Steg has described are consistent with her symptomatology and her level of performance. I do think this is going to be a chronic thing for Kathrine and very likely will not be curable. In fact, I believe a lot of her symptoms are most likely from fibromyalgia, a chronic disorder characterized by muscle pain, joint pain, tendonitis, and sleep distrubance [sic]. She does admit that she awakens frequently. Certainly, fibromyalgia can be exacerbated by trauma and repetitive motion. I do believe that Dr. Steg's impairments are accurate, well thought out, and consistent with current methodologies in calculating disability. Therefore, I would have nothing to add to his report, and I do believe it is accurate and consistent with Kathrine's clinical presentation.
>
>    Further treatment will be basically geared toward symptom control, and we will retry some things that in the past have met with less than optimal success, but we will not be able to cure this. I am skeptical that we will be able to increase her performance rating very much at all.

5

On July 24, 2004, Douglas W. Martin, M.D. performed an independent medical evaluation of McKee in connection with her worker's compensation claim. At that time, McKee complained of continued pain in both hands, both elbows, her right shoulder, right armpit, right side of her neck, shoulder blade, and lower back into the hips. She stated repetitive motion, lifting, reaching above her head, and folding laundry all made her pain worse. She stated she obtained some pain relief by stopping these activities, taking Tylenol, and using ice and occasional wrist splints. She complained of problems falling asleep and staying asleep, poor energy level, and significant daytime fatigue.

McKee also complained of occasional swelling in her right shoulder girdle; persistent numbness and tingling into her right little finger, with occasional numbness and tingling in all of her right fingers at night; and daily headaches lasting between thirty and forty-five minutes each. Other than the Tylenol, the only medication McKee reported taking was Clonazepam 2 mg. at bedtime.[2] McKee also reported a fifteen-year smoking history, stating she smoked a little over one pack per day. The doctor noted McKee had a flat affect, although she responded appropriately to questions.

Dr. Martin's assessment of McKee included fibromyalgia; right shoulder impingement syndrome with possible acromioclavicular degenerative joint disease; status post bilateral carpal tunnel release procedures, bilateral DeQuervain's release procedures, and radiofrequency ablation procedure for lateral elbow pain; bilateral volar ganglionectomies; irritable bowel syndrome; gastroesophageal reflux disease; and possible depression. He termed McKee's prognosis to be poor. Dr. Martin recommended McKee's fibromyalgia be treated with aerobic cardiovascular exercise, tricyclic antidepressants, "and an understanding that activity level should be returned to normal as quickly as possible." He found no indication that her right shoulder impingement syndrome had been treated, and he

---

[2]According to the Internet Drug Index, www.rxlist.com, Clonazepam is used to treat certain seizure disorders and panic disorder.

Case 5:06-cv-04077-PAZ   Document 12   Filed 09/27/07   Page 6 of 19

suggested anti-inflammatory medications and four to six weeks of physical therapy, with injections and other treatment to be considered if McKee gained no relief from the more conservative treatment. He recommended McKee be evaluated for possible depression, and recommended her irritable bowel syndrome and GERD be investigated further to determine whether or not they required treatment. He found that no additional diagnostic testing or treatment was warranted for McKee's complaints of muscular aches and pains in her upper extremities.

On September 1, 2004, Andrew K. Brevik, D.O. examined McKee at the request of the state agency. He completed a fibromyalgia evaluation sheet on which he noted positive findings in all areas, including the control points. He found McKee to have "significant debility secondary to her right upper extremity weakness and considering her bilateral carpal tunnel release with de Quervain's Syndrome and right rotator cuff pathology." He recommended McKee lift no more than five pounds and "avoid all repetitive activities which could exacerbate her symptoms."

On October 19, 2004, McKee's application for benefits was denied initially. In connection with the denial, J.D. Wilson, M.D. indicated McKee would be "limited to light, one-armed jobs." He found she could not return to her past work, but she would be capable of working as a call-out operator, charge account clerk, or usher. Dr. Wilson reviewed the record and completed a Physical Residual Functional Capacity Assessment form on which he indicated McKee should be able to lift up to twenty pounds occasionally and ten pounds frequently; stand and/or walk, and sit, for about six hours each in an eight-hour workday; push and/or pull without limitation; climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally; never climb ladders, ropes, or scaffolds; and only occasionally use her right upper extremity for reaching, handling, and fingering. He found she would have no sensory/feeling limitations, and no visual, communicative, or

7

environmental limitations. On December 14, 2004, Claude H. Koons, M.D. reviewed the record and concurred in Dr. Wilson's findings.

McKee saw Dr. Kosters once in November 2004, twice in December 2004, and then monthly in January, February, and March 2005. At each appointment, McKee continued to complain of widespread myalgias. Her white blood count was up and she apparently was referred to Dr. Michael McHale, a specialist in hematology, oncology, and internal medicine; however, no reports from Dr. McHale appear in the record. Dr. Kosters noted no cause had been determined for McKee's elevated white blood count. Over the five-month period from November 2004 through March 2005, he prescribed Levaquin, a broad-spectrum antibiotic; Flexeril, a muscle relaxant; Decadron, a synthetic steroid; Doxycycline, an antibiotic; Skelaxin, a muscle relaxant; Cephalexin, an antibiotic; Naproxen, a nonsteroidal anti-inflammatory agent; an injection of Rocephin, an antibiotic; heat; Tylenol; a noncontrast head CT (which was normal); an MRI of her head (results unknown); and x-rays of her leg that showed no signs of osteomyelitis, fracture, or bone chip.

At the time of the hearing in January 2006, McKee stated she can lift a gallon of milk with either hand, but she cannot carry it for any distance. She cannot carry a ten-pound bag of sugar. She does little in the way of household chores, stating she will pick up clothes lying around and put the dog out. If she tries to do more, she experiences pain in her neck, back, and/or hands, and she gets migraine headaches. McKee was not taking any medications as of January 2006. She stated she previously was getting shots from Dr. Kosters for her migraines, but she stopped going to doctors for treatment in March 2005, because she no longer has health insurance and she is unable to pay the doctors' bills.

McKee was terminated from her job at the bag company on March 23, 2004, her alleged disability onset date in this case. She applied for and received unemployment

compensation through about July of 2004. She applied for a number of jobs during 2004 and 2005, including factory jobs, an egg inspector job, and positions at Wal-Mart and Shopco. When she applied for work, she provided information on the restrictions her doctors have placed on her functional abilities. She was not hired for any of the jobs, but none of the prospective employers provided her with the reasons she was not hired. McKee worked with a vocational rehabilitation counselor for a period of time, but her file was closed in the fall of 2005. According to McKee, her file was closed because she had not obtained a G.E.D., and the counselor did not have any jobs in the area that fit McKee's qualifications and work restrictions. McKee stated she has not taken a G.E.D. course because she does not have the $70 it would cost her to take the test. She believes she would be unable to work full time because of chronic pain and the permanent work restrictions placed on her by her doctors.

Regarding her daily activities, McKee stated she mostly just "ramble[s] around the house," and watches the birds outside. She does not participate in any of her children's school activities. She is still a smoker, and smokes about a pack-and-a-half per day.

Steven McKee, the claimant's husband, stated his wife usually is able to do the dishes, but she has difficulty vacuuming, mowing the lawn, or carrying a laundry basket. He has observed that when his wife attempts to lift things, it causes her pain. He indicated McKee can drive, but he usually does all of the driving. She may drive to the post office or to her son's house to see her grandchildren, but those destinations are not far from home. He stated McKee can ride in the car with the seat reclined for about forty-five minutes at a time before she begins to get uncomfortable.

### B. *Vocational expert's testimony*

VE William Tucker indicated McKee's work experience would not have provided her with any skills transferable to other skilled light or sedentary work. The ALJ asked the VE to consider an individual of younger age (i.e., under fifty years old), with an 11th

9

grade education and McKee's work history, with limitations such as those described by McKee. The VE noted McKee testified to limitations in the repetitive use of her hands; no lifting over eight pounds with either hand; periodic numbness in her fingers; and problems with excessive absenteeism. With those limitations, the VE indicated McKee's past relevant work would be eliminated, as would "probably any other work that [he] could identify." (R. 233)

The ALJ next asked the VE to consider the same individual, but with limitations consistent with the state agency's assessment, as follows:

> [W]hat if a person could occasionally lift or carry 20 pounds, frequently 10 pounds, could stand and/or walk and/or sit with normal breaks about six hours of eight, push/pull is unlimited, posturally, they're all occasional except no climbing of ladders, ropes, or scaffolds. From a manipulative standpoint, they do not limit feeling. They do limit in the areas of reaching, handling and fingering to occasional use with the right upper extremity. And you need to assume, further assume, that the right is the non-dominant upper extremity. There's no[] visual or communicative limits. Environmentally, there's no limits. Whether or not it allow[s] for any jobs, we've yet to learn. But this sounds like some kinda range of light work?

The VE indicated that although the hypothetical individual would be unable to return to any of McKee's past relevant work, she would be able to perform light work such as inspector and hand packager, marker or labeler, and cashier II.

The ALJ next asked the VE to consider the same individual, but with restrictions consistent with those indicated by the worker's compensation evaluator, as follows:

> Assume a hypothetical person . . . who should restrict lifting with the hands to less than five pounds, restrict use of the hands for repetitive grasping, pushing, pulling, and fine manipulation to an occasional basis only. Avoid working with the right arm at or above shoulder level, and should limit

10

> working in a bent over position to an occasional basis. Is this
> consistent or inconsistent with past work?

The VE indicated the hypothetical individual would be unable to perform any of McKee's past relevant work. He further indicated the five-pound lifting restriction and only occasional repetitive use of the hands would put the individual at the sedentary level and "effectively eliminate any employment."

### C.     *The ALJ's decision*

The ALJ found McKee "has the following severe combination of impairments: status post bilateral carpal tunnel releases; status post bilateral DeQuervain's releases and volar ganglionectomies of the wrists; status post ablation procedure for lateral epicondylitis of the right elbow; and right shoulder impingement syndrome[.]" However, he further found McKee's impairments, either singly or in combination, do not meet or medically equal a listed impairment in the regulations. Specifically, the ALJ found McKee "remains able to perform fine and gross manipulations, especially with the left upper extremity, and she ambulates effectively. For example, [she] reports that she performs personal care, dresses herself, and does light household tasks, such as making her bed and picking up shoes and papers."

The ALJ determined that McKee retains a residual functional capacity consistent with the state agency's assessment. He found McKee's medically-determinable impairments could be expected to produce the symptoms she alleges; however, the severity of her allegations of pain and limitations is not consistent with objective laboratory and clinical findings during the period at issue. The ALJ was unconvinced by McKee's assertion that she has not sought medical care because she could not afford it, noting McKee "is able to afford a pack and a half of cigarettes daily, which is the amount she testified that she smokes."

The ALJ found McKee is unable to return to any of her past relevant work, but considering her residual functional capacity as determined by the ALJ, and McKee's age,

11

education, and work experience, a significant numbers of jobs exist in the national economy that McKee can perform, including inspector and hand packager, "marker or laborer [sic]," and "cashier II." Therefore, the ALJ found McKee not to be disabled at any time through the date of his decision.

## *II. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD*

### *A. Disability Determinations and the Burden of Proof*

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, ___ F.3d ___, 2007 WL 2593631 at * 2 (8th Cir. Sept. 11, 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003. First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits

12

the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

13

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant

14

cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### *B. The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would

15

accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported

16

an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

17

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

### *III. DISCUSSION*

The court has reviewed the record thoroughly and finds the ALJ erred in assessing McKee's residual functional capacity, and substantial evidence does not exist to support his conclusion that McKee is able to work. The court finds substantial evidence in the record supports the residual functional capacity found by Dr. Steg, and affirmed by McKee's treating physician Dr. Kosters, and examining physician Dr. Brevik. When a hypothetical question was posed to the VE containing those limitations, the VE indicated McKee would be unable to work in any competitive employment. The only hypothetical question posed to the VE that elicited a response indicating the individual could work was the question that included the limitations found by Dr. Wilson, the state agency consultant, who conducted only a paper review of the record and never examined McKee. The court finds Dr. Wilson's assessment of McKee's residual functional capacity is not support by the record evidence, and the ALJ erred in giving Dr. Wilson's assessment controlling weight over the opinions of physicians who examined, and in one case treated, McKee.

However, the court further finds McKee's disability onset date to be later than she alleges. McKee applied for and received unemployment compensation through July 2004. As she acknowledged in her testimony, in order to receive those benefits, she had to certify to the State of Iowa that she was "ready, willing, and physically able to work." McKee stated she felt she was able to work at the time, but she could not obtain work. However, a claimant's employability is not part of the disability determination. *See* 20 C.F.R. § 404.1566(a)(3) (& (c). The court finds McKee cannot be found disabled for the period

18

when she was receiving unemployment compensation. *See Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997). However, substantial evidence in the record establishes that McKee was disabled from and after August 1, 2004.

The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." *Cline*, 939 F.2d at 569 (citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v. Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Thomas v. Apfel*, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits).

Accordingly, the decision of the Commissioner is **reversed**, judgment will be entered for McKee, and this case is **remanded** pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits from and after August 1, 2004.

**IT IS SO ORDERED.**

**DATED** this 27th day of September, 2007.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT